## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

Douglas Weaver,

       Plaintiff                 Case No.

v.                                    Hon.

Monsanto Company, Inc.

       Defendant.

_____/

Alyson Oliver (P55020)
Cameron Bell (P81934)
Paul Matouka (P84874)
OLIVER LAW GROUP PC
1647 W. Big Beaver Road
Troy, MI 48084
(248) 327-6556
notifications@oliverlawgroup.com

*Attorneys for Plaintiff*

_____/

### <u>COMPLAINT AND JURY DEMAND</u>

    NOW COMES Plaintiff Douglas Weaver, by and through his attorneys

OLIVER LAW GROUP P.C. and makes his complaint against Defendant Monsanto

Company, Inc. ("Monsanto") as follows:

## I.    INTRODUCTION

1. In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup.

2. Since that time, Defendant Monsanto has marketed and sold Roundup, its formulations, and derivative products, including, but not limited to: RoundUp Quick-Pro, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden FoamWeed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2,Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass KillerConcentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed& Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-

Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate, hereinafter referred to collectively as, "Roundup" and/or "Roundup."

3. Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

4. Defendant Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Defendant Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready brand. The stated advantage of Roundup Ready crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready.

5. Defendant Monsanto's glyphosate products and glyphosate-based formulations are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm

that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

6. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluationof several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world and it has traced the health implications from exposure to glyphosate since 2001.

7. On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough reviewof the numerous studies and data relating to glyphosate exposure in humans.

8. The IARC Working Group classified glyphosate as a Group 2A carcinogen, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposureare non-Hodgkin's lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

9. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

10. More likely than not, glyphosate causes Chronic Lymphocytic Leukemia ("CLL").

11. CLL is a type of low-grade non-Hodkin's lymphoma.

12. Nevertheless, Defendant Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Defendant Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, includingRoundup®, create no unreasonable risks to human health or to the environment.

## II.    PARTIES

13. Plaintiff Douglas Weaver is a resident of Davisburg, in Oakland County, Michigan.

14. In September 2019, Douglas Weaver was diagnosed with CLL.

15. Douglas Weaver has been consistently using Roundup products at his homes for over 30 years.

16. Defendant Monsanto Corporation is incorporated in Delaware with its headquarters and principal place of business in St. Louis, Missouri. Monsanto Corporation is a citizen of Delaware and Missouri.

17. At all times relevant to this complaint, Defendant Monsanto discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup.

18. Defendant Monsanto has regularly transacted and conducted business within this judicial district for years, and has derived substantial revenue from goods and products, including Roundup, used in this judicial district during that same time.

19. Defendant Monsanto expected or should have expected their acts to have consequences within the State of Michigan, and derived substantial revenue from interstate commerce.

20. Plaintiff is informed and believes that Defendant Monsanto did design, sell, advertise, manufacture, and/or distribute Roundup with full knowledge of its dangerous and defective nature.

21. Plaintiff is informed and believes that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendant was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendant and their directors, officers and/or managing agents.

### III.             JURISDICTION AND VENUE

22. Jurisdiction is proper pursuant to 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.

23. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred within this jurisdiction.

24. Specifically, Plaintiff's exposure to Roundup products and resulting diagnosis with non-Hodgkin's lymphoma took place within this judicial district.

25. The Eastern District of Michigan has personal jurisdiction over Defendant Monsanto because it is authorized to do business in Michigan and has sufficient minimum contacts within the jurisdiction, or otherwise intentionally avails itself of this judicial district's market so as to render the exercise of jurisdiction over it by this Court consistent with traditional notions of fair play and substantial justice.

26. Furthermore, Defendant Monsanto's minimum contacts within this judicial district are sufficiently related to Plaintiff's exposure, diagnosis, injuries, and claim in this matter to render personal jurisdiction in this judicial district proper.

## IV.    FACTUAL ALLEGATIONS

27. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

28. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die

within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

29. For over 40 years, farms across the world have used Roundup without knowing of the dangers its use poses. That is because when Defendant Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup – glyphosate – is a probable cause of cancer. Defendant Monsanto assured the public that Roundup was harmless. In order to prove this, Defendant Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Defendant Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup was safe.

### The Discovery of Glyphosate and Development of Roundup

30. The herbicidal properties of glyphosate were discovered in 1970 by Defendant Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Defendant Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup as safe today.

*Registration of Herbicides under Federal Law*

31. The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a)

32. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

33. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in

determining whether a registration should be granted or allowed to continue to be sold in commerce.

34. The EPA registered Roundup for distribution,sale, and manufacture in the United States.

35. FIFRA generally requires that the registrant, Defendant Monsanto in the case of Roundup, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

36. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

37. In the case of glyphosate, and therefore Roundup®, in January of 2020, the EPA released an Interim Registration Review determining that "glyphosate is

not likely to be carcinogenic to humans." However, this finding is inconsistent with the conclusions of the WHO and other scientific studies.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

38. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Defendant Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

39. On two occasions, the EPA found that the laboratories hired by Defendant Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

40. In the first instance, Defendant Monsanto, in seeking initial registration of Roundup by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about

30tests on glyphosate and glyphosate-based formulations, including nine of the 15 residue studies needed to register Roundup®.

41. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

42. Three top executives of IBT were convicted of fraud in 1983.

43. In the second incident of data falsification, Defendant Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

44. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Defendant Monsanto was marketing Roundup in 115 countries.

*The Importance of Roundup® to Defendant Monsanto's Market Dominance Profits*

45. The success of Roundup was key to Defendant Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Defendant Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Defendant Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

46. In response, Defendant Monsanto began the development and sale of genetically engineered Roundup Ready seeds in 1996. Since Roundup Ready crops are resistant to glyphosate; farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Defendant Monsanto to expand its market for Roundup even further; by 2000, Defendant Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Defendant Monsanto's dominant share of the glyphosate/Roundup market througha marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup® herbicide.

47. Through a three-pronged strategy of increased production, decreased

prices and by coupling Roundup with Roundup Ready seeds, Roundup® became Defendant Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Defendant Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Defendant Monsanto has known for decades that it falsely advertises the safety of Roundup®*

48. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Defendant Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Defendant Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

    a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences …

    b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

    c) Roundup biodegrades into naturally occurring elements.

d)  Remember that versatile Roundup herbicide stays where you put it.That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)  This non-residual herbicide will not wash or leach in the soil. It … stays where you apply it.

f)  You can apply Accord with "confidence because it will stay where youput it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)  Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)  "Roundup can be used where kids and pets will play and breaks downinto natural material." This ad depicts a person with his head in theground and a pet dog standing in an area which has been treated with Roundup.

49. On November 19, 1996, Defendant Monsanto entered into an Assurance of Discontinuance with NYAG, in which Defendant Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)  its glyphosate-based pesticide products or any component thereof aresafe, non-toxic, harmless or free from risk.

14

b) its glyphosate-based pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c) its glyphosate-based pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) its glyphosate-based pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) glyphosate-based pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-based formulations or any component thereof might

be classified as "practically non-toxic."

50. Defendant Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

51. In 2009, France's highest court ruled that Defendant Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgement that Defendant Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### *Classifications and Assessments of Glyphosate*

52. The IARC process for the classification of glyphosate followed the

stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be ProbablyNot Carcinogenic.

53. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

54. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final

Monograph is finalized and published.

55. In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

56. In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

57. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

58. The studies considered the following exposure groups: occupational

exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

59. Glyphosate was identified as the second-most used household herbicidein the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

60. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

61. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

62. The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

63. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

64. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

65. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

66. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

67. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

68. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a

self- administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

69. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

*Recent Worldwide Bans on Roundup®/Glyphosate*

70. Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-based herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup are more widely known.

71. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which takes effect by the end of 2015. In issuing theban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

72. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

73. France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.

74. Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows:

"Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

75. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

76. The government of Columbia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

### *Douglas Weaver's Exposure To Roundup*

77. Douglas Weaver consistently used Roundup from 1986 at his first home in Michigan and continuing from 1989 at his second home until 2019.

78. Douglas Weaver has only purchased Roundup in pre-mixed gallon jugs.

79. Douglas Weaver used the Roundup applicator to apply Roundup to his property.

80. Douglas Weaver has never used any other herbicide on his property.

81. Douglas Weaver ceased using Roundup in 2019 when he first heard of its carcinogenic properties.

### *Equitable Tolling of Applicable Statute of Limitations*

82. Plaintiff re-alleges and reincorporates all preceding paragraphs.

83. The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

84. At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

85. As of June 15, 2021 Defendant continues to claim that "[t]he widespread adoption of glyphosate-based products is due not only to their effectiveness and extensive economic and environmental benefits, but also due to the strong safety profile of these products."[1]

86. Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant spent enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies

---

[1] *Human Health Research*, Bayer (updated Feb. 3, 2021), https://www.bayer.com/en/glyphosate/glyphosate-impact-on-human-health-and-safety (last accessed June 15, 2021).

to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the doctrine of fraudulent concealment from relying upon any statute of limitations.

## COUNT I: Negligent Design

87. Plaintiff re-alleges and reincorporates all preceding paragraphs.

88. At all times herein mentioned, the Defendant designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup as hereinabove described that was used by the Plaintiff.

89. Defendant was, or should have been, aware of the unreasonable risk Roundup presented regarding NHL and other forms of cancer.

90. The Roundup used by Plaintiff was received by him in the same form as it was when it left Defendant's control.

91. At all times, Plaintiff used Roundup consistent with the instructions on use and did not alter or misuse it.

92. Due to Defendant's fraudulent misrepresentations regarding the safety of Roundup, Plaintiff was unaware of its carcinogenic properties.

93. Defendant's design was negligent because safer because glyphosate poses a very high magnitude of risk – cancer and death – and other products exist that achieve the same result without posing the same risk.

94. For example, herbicides such as glufosinate, vinegar-based herbicides, and pelargonic acid are all other forms of non-selective weed control that are not known to pose the same type of carcinogenic risks as Roundup.

95. While Roundup had FDA approval for use and was purported to be in compliance with federal regulations, approval was obtained through the use of fraudulent scientific studies and the product was not in conformity with the applicable regulations.

96. Specifically, Defendant's failure to include a warning or caution statement with respect to its carcinogenic effects was in violation of 7 U.S.C. § 136j(a)(1)(E).

97. Despite the availability of less dangerous alternatives capable of achieving substantial similar results, Defendant continued to manufacture, sell, and advertise Roundup as a safe herbicide.

## COUNT II: Negligent Design - Failure to Warn

98. Plaintiff re-alleges and reincorporates all preceding paragraphs.

99. At all times that Plaintiff purchased and used Roundup, Defendant was aware of its carcinogenic properties.

100. Defendant's product was marketed for sale to common consumers for use at home, such as Plaintiff.

101. Defendant failed to provide any warning of Roundup's carcinogenic risks in violation of 7 U.S.C. § 136j(a)(1)(E).

102. Instead, Defendant advertised its product as safe and effective.

103. Defendant's product was not safe.

104. As a result of Defendant's failure to warn Plaintiff of the carcinogenic risks of its product, Plaintiff used Roundup for decades – ultimately leading to his diagnosis with CLL.

## COUNT III: Fraud and Misrepresentation

105. Plaintiff re-alleges and reincorporates all preceding paragraphs.

106. Defendant Monsanto failed to provide any warning regarding the risk of developing non-Hodgkin's Lymphomas, including CLL, associated with the use of Roundup.

107. In fact, Monsanto made affirmative representations regarding the safety of Roundup.

108. Monsanto was aware of the carcinogenic risks posed by Roundup as early as the 1980s and went so far as to commission fraudulent studies to hide this fact.

109. Plaintiff relied on Defendant's assertions that Roundup was safe for use when he purchased and used it.

110. As a result of Defendant's fraudulent statements Plaintiff believed that Roundup was safe and used it for decades until learning of its carcinogenic properties.

111. By the time Plaintiff learned of Roundup's carcinogenic properties it was too late to avoid developing CLL from his decades of exposure to glyphosate.

### COUNT IV: Breach of Implied and Express Warranties

112. Plaintiff re-alleges and reincorporates all preceding paragraphs.

113. Defendant put Roundup in the stream of commerce with the intent and knowledge that it would reach consumers such as Plaintiff.

114. Defendant marketed its product as safe and effective for commercial and private use in controlling weeds.

115. Defendant's product was not safe for commercial or private use and posed an unreasonable risk of causing injury when used in its intended manner.

116. Furthermore, Defendant breached the implied warranty of merchantability because Roundup was not fit for its intended use.

117. Plaintiff relied upon Defendant's express warranties of safety and implied warranty of merchantability when purchasing and utilizing Roundup.

118. Plaintiff utilized Roundup in the manner intended by Defendant – controlling weeds – and was injured as a result of the products carcinogenic effects.

119. Therefore, Defendant breached both express and implied warranties by selling a product known to have dangerous carcinogenic properties when used as intended.

120. Plaintiff is one of the unfortunate many who developed forms of NHL as a result of Defendant's breach of express and implied warranties.

WHEREFORE, Plaintiff respectfully requests this court grant judgment against the Defendant on each of the above-referenced claims and causes of action as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial;

2. Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs;

3. Awarding economic damages in the form of medical expense, out of pocket expenses, and other economic damages in an amount to be determined at trial;

4. Punitive damages for Defendant's wrongful conduct which led to Plaintiff's injuries;

5. Pre-judgment interest;

6. Post-judgment interest;

7. Awarding Plaintiff reasonable attorney's fees and costs;

8. Any further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Respectfully Submitted,

OLIVER LAW GROUP P.C.

Date:  November 29, 2022                /s/ Alyson Oliver
                                        Alyson Oliver (P55020)
                                        1647 W. Big Beaver Rd.
                                        Troy, MI 48084
                                        T: (248) 327-6556
                                        E: notifications@oliverlawgroup.com